Michael NETZER, Plaintiff,

v.

CONTINUITY GRAPHIC ASSOCIATES, INC., Continuity Publishing, Inc., Neal Adams, Kristine Adams, a/k/a Kris Hartz and Peter Stone, Defendants.

No. 93 Civ. 5870 (RWS).

United States District Court, S.D. New York.

April 7, 1997.

Fagan & Associates, New York City, for Plaintiff; Edward D. Fagan, of counsel.

Grimes & Battersby, Mamaroneck, NY, for Defendants; Charles W. Grimes, of counsel.

## OPINION

SWEET, District Judge.

Defendants Continuity Graphics Associates, Inc. ("Continuity Graphics"), Continuity Publications, Inc. ("Continuity"), Neal Adams ("Adams"), Kristine Adams, a/k/a Kris Hartz ("Kristine") and Peter Stone ("Stone") (collectively, the "Defendants"), have moved for summary judgment under Rule 56, Fed. R.Civ.P., dismissing the complaint of plaintiff Michael Netzer ("Netzer") alleging, *inter alia*, that the Defendants defrauded him, breached certain undertakings and infringed his copyright in a comic strip character, Ms. Mystic. The complaint also alleges libel, invasion of privacy, and intentional tort arising out of the use by the Defendants of the names "Abu Netzer" and "Mike Nasser" (the "Names") in a comic book entitled "Crazyman."

For the reasons below, the Defendants' motions will be granted.

### The Parties

Netzer was born Michael Nasser and is a resident of Israel and a comic book artist, who in 1975, as a teenager, moved to New York and worked with Adams at his studio, Continuity Graphics. In 1981 Netzer moved to Lebanon, then to Israel in 1983, where he changed his name to Netzer. He came back to the United States in 1990 and returned to Israel in 1993.

Adams was and is a comic book and commercial artist well known in his field for, among other things, his creation of Batman. Adams and Netzer initially had a close relationship, and Adams considered himself a mentor to Netzer.

In 1984 Adams and Kristine, his daughter, began publishing comic books through Continuity, a New York corporation which published a *Ms. Mystic* comic book. Continuity ceased doing business in 1994.

Stone is a New York resident who was a script writer for *Crazyman* in the strip which used the Names.

### Prior Proceedings

Netzer filed his complaint in this action on August 20, 1993. The complaint alleged eighteen counts, including fraud in depriving Netzer of his rights in Ms. Mystic, fraudulent inducement to enter a contract with respect to his rights, breach of contract, breach of warranties, implied and in fact, negligent performance of the contract, failure to disclose material facts, failure of the Defendants to perform their duty to Netzer as a co-author, both at common law and in equity, rescission, unauthorized exploitation of Ms. Mystic, tortious interference with Netzer's business affairs, deceptive practices under General Business Law § 349, infringement of

copyright and trademark, and with respect to the use of the Names in *Crazyman,* libel, invasion of privacy and intentional infliction of emotional distress. The allegations of the complaint were denied by the Defendants.

Discovery proceeded, and on June 29, 1995 the Defendants filed the instant motions. After the motions were fully briefed, the action was transferred on January 28, 1997 to this court pursuant to Rule 16 of the Rules for the Division of Business Among District Judges of the Southern District of New York. After transfer, the parties agreed the motions would be considered on submission.

### The Facts

This is a cautionary and perhaps generational tale of the falling out between two formerly close associates, Adams and Netzer, and the resulting dispute between them. The parties' versions of what happened in certain instances sharply diverge and in the context of this summary judgment motion, those divergences will be noted, notwithstanding that the Defendants' Statement under Rule 3(g) stands unopposed.

According to Netzer, during the time Adams and Netzer were working together in 1977, Vinnie Colletta, an inker and art director at DC Comics, the industry leader, suggested the creation of a new character which Netzer conceived of as a witch who would be burned at the stake and resurrected by a deity which had appeared in a comic book *Deadman* drawn by Adams in the 1960's. According to Netzer, he began sketching this proposed character. Adams allegedly observed his work, offered to work together on the project, and then produced a drawing of a female super hero, Ms. Mystic, with a costume of Zipatone (an acetate stick-on material) The initial conversation between Adams and Netzer is referred to in the patois of the litigation as the "I can write it, you can draw it" conversation. Netzer has also testified at deposition that Adams proposed that he and Netzer be "Partners, 50/50" in Ms. Mystic, a proposal which Netzer testified that he accepted.

According to Netzer, he prepared drawings and a story outline for Ms. Mystic, though no documentary support for these assertions has been produced. It is Netzer's position that DC Comics had made an undertaking to publish Ms. Mystic, and Netzer maintains that he was paid for 18 pages of pencilled drawings in July, September and November 1977. Although Netzer testified that he had submitted photocopies of his drawings, an original pencilled drawing has been produced with a 1978 DC Comics copyright stamp. Payment for all work performed for DC Comics was made by check bearing a legend stating that DC Comics owned all rights to the property for which payment was made. For perhaps personal reasons the relationship between Adams and DC Comics terminated, and no further discussions or actions took place with respect to Ms. Mystic. Netzer indicated that he considered the Ms. Mystic project "shelved" at that time.

In 1979, Adams published *New Heroes Portfolio,* which contained six drawings of previously unpublished super heroes, including Ms. Mystic. The copyright notice credited Netzer as co-owner of Ms. Mystic. Both Adams and the producer of the portfolio have testified that this attribution was a mistake. In 1981 Netzer left the United States for the Middle East.

The Ms. Mystic character next appeared in 1982 in a Pacific Comics *Captain Victory* comic book. Later that year, Pacific Comics published *Ms. Mystic* No. 1. The inside cover of *Ms. Mystic's* announces an upcoming issue of *Ms. Mystic.*

A second issue of *Ms. Mystic* was published in 1984. In each of these publications, the copyright legend identified Adams as the sole owner. Pacific Comics ceased publishing, and in November 1984 Continuity published "Echoes of Future Past," and began publishing *Ms. Mystic* comics in 1987.

Netzer became aware of Pacific's publication of *Ms. Mystic* in the summer of 1983, and he sought to obtain a copy of *Ms. Mystic* No. 1, which arrived in the summer of 1984. Netzer testified at his deposition that he called and spoke with Neal Adams in mid–1985 and was assured that the copyright attribution was a mistake and that no money had been made from *Ms. Mystic.* Netzer sought and obtained payment for the use of

his layout work in connection with *Ms. Mystic*.

Netzer, who had suffered a number of personal difficulties, returned to the United States in 1990 and saw a drawing of Ms. Mystic at Continuity in May 1990. Plaintiff testified that he knew by August 1990 that Pacific Comics had published *Ms. Mystic* No. 2 and that Continuity had published additional *Ms. Mystic* comics. In January 1991, Netzer had conversations with Kristine Adams and Neal Adams in which he asserts that he made an unsuccessful ownership claim to *Ms. Mystic*. Adams has admitted to telling Netzer in this context that "negative things" would happen if Netzer pursued his claim. In December 1992, Netzer claims to have learned for the first time of the *New Heroes* copyright attribution. The action relating to *Ms. Mystic* was filed on August 20, 1993.

In 1993, Continuity published a comic book series "Crazyman" and in August 1993, 10,-000 copies of *Crazyman* No. 3 were shipped and published. Stone, a comic book writer, wrote the panel by panel breakdown in *Crazyman* No. 3.

The comic book series "Crazyman" tells the story of Danny, a "crazy" man who has extraordinary physical strength fueled by the internal chemical energy produced by his derangement, a concept developed by Adams in the late 1970's. Danny is deployed by the Aker Corps, a fictitious international extra-governmental agency dedicated to "helping the world." Various other characters in the *Crazyman* comic book series also have extraordinary powers. For example, the heroine Chris, an Aker Corps agent, has a mechanical eye capable of x-ray vision, video recording, and the like.

The front cover of each *Crazyman* comic, including Issue No. 3, states that "any similarities to real people or places in fiction and semi-fiction is [sic] purely coincidental."

*Crazyman* No. 3 concerns Danny's search for Marvin Grosser, a character who works for Tau Chemical (the fictitious corporate front for the villains in the series), who had tortured Danny in an earlier issue of *Crazyman*. At the beginning of Issue No. 3, Danny and the Aker Corps agents, including Dr. Aker, have arrived at a bank. Their mission is to retrieve from a safe deposit box the name and location of a doctor who is in hiding. To enlist Danny's assistance, Aker has told Danny that this doctor will be able to cure his insanity. Unbeknownst to the Aker Corps, Marvin Grosser, working for Tau Chemical, has hired terrorists to kidnap Dr. Aker and steal the information that he retrieves from the safe deposit box. During the fracas following the kidnaping, Danny kills the lead terrorist. The heroine Chris then feeds a video recording of the terrorist's face from her mechanical eye into a computer. In the next panel, the computer identifies the leader of the trio of terrorists from the crime files of Interpol. This identification is depicted in the comic book by a close-up drawing of the computer screen showing the dead terrorist's fictional crime file. In the computer screen, the names "Mike Nasser" and "Abu Netzer" are listed as aliases for Abu Nissir, the dead fictional terrorist character in the comic book. He is also described as a Moroccan with seven outstanding warrants for murder and terrorism.

The clues in the computer screen lead the protagonists to Morocco where they are able to track down Tau Chemical's secret hideout and rescue Dr. Aker.

The lead terrorist was drawn by a Georgia-based free-lance artist who had never met Netzer and who prepared the artwork before Adams and Stone decided to use the Names as aliases.

## Discussion

### I. *The Standard for Summary Judgment*

Rule 56(e) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Silver v. City Univ.*, 947 F.2d 1021, 1022 (2d Cir.1991).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the

undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

A party seeking to defeat a summary judgment motion cannot "rely on mere speculation or conjecture as to the true nature of facts to overcome the motion." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (*quoting Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). Rather, the responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna Records, Inc.*, 887 F.Supp. 560, 564 (S.D.N.Y.1995).

## II. *The Ms. Mystic Claims*

Counts 1–14 and 18 of the Complaint assert claims arising out of the Defendants' publication of *Ms. Mystic* comic books. These claims are based on Netzer's assertion that he and Adam's co-authored the Ms. Mystic concept and that Adams made various representations that he would secure publication and that he and Netzer would share in the profits from Ms. Mystic's exploitation.

### A. *The Copyright Claim is Time Barred*

Although Count 18 alleges copyright "infringement," and the complaint seeks traditional remedies for infringement, Netzer has conceded in his deposition testimony and on this motion that his claims are claims of co-authorship and co-ownership, not infringement. As the Second Circuit stated in

*Weissmann v. Freeman*, 868 F.2d 1313 (2d Cir.1989), "an action for infringement between joint owners will not lie because an individual cannot infringe his own copyright. The only duty joint owners have with respect to their joint work is to account for profits." *Id.* at 1318.

Civil actions under the Copyright Act are subject to a three-year statute of limitations. 17 U.S.C. § 507(b). In *Merchant v. Levy*, 92 F.3d 51 (2d Cir.1996), the Second Circuit held that "plaintiffs claiming to be co-authors are time-barred three years after accrual of their claim from seeking a declaration of copyright co-ownership rights and any remedies that would flow from such a declaration." *Id.* at 56.[1] The *Merchant* court reasoned that such a rule "promotes the principles of repose integral to a properly functioning copyright market." This rule is also consistent with the Supreme Court's recognition that "Congress' paramount goal in revising the 1976 [Copyright Act was] enhancing predictability and certainty of copyright ownership." *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 749, 109 S.Ct. 2166, 2177, 104 L.Ed.2d 811 (1989).

A cause of action accrues when a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right. *Stone v. Williams*, 970 F.2d 1043, 1048 (2d Cir.1992); *see also Merchant*, 92 F.3d at 56. An express assertion of sole authorship or ownership will start the copyright statute of limitations running. *See Zuill v. Shanahan*, 80 F.3d 1366, 1370 (9th Cir.1996).

Based on the uncontested facts, Netzer's co-authorship claim accrued no later than the summer of 1984 when Netzer received a copy of *Ms. Mystic* No. 1, which bore a copyright notice reading: "MS. MYSTIC (including all prominent characters fea-

---

1. *Merchant* was decided on August 7, 1996, after Defendants submitted their original motion on June 30, 1995 and Plaintiffs filed their opposition brief on November 3, 1995, but before Defendants filed their reply brief on September 17, 1996. The parties' initial briefing was based on the assumption that, under *Stone v. Williams*, 970 F.2d 1043 (2d Cir.1992), the three year statute of limitations did not apply to claims of co-ownership. However, *Merchant* clarified that "*Stone* stands for the narrow proposition that, in certain situations, the statute of limitations will not be applied to defeat the copyright co-ownership claim of an author's relative accruing more than three years before the lawsuit where uncertainty surrounded the relative's status as a member of the author's family." 92 F.3d at 56. Unlike *Stone*, and like *Merchant*, there is no uncertainty with respect to the claims of co-ownership based on co-authorship, since a co-author knows that he or she has jointly created a work from the moment of its creation. *See id.*

tured in this magazine and the distinctive likenesses thereof) is copyrighted 1982 by Neal Adams."

Thus, the statute of limitations for the claim expired in the summer of 1987. Unless there is a basis for tolling the limitations period, Netzer's copyright claim is time barred.

Netzer seeks to justify his delay in bringing suit on three distinct grounds. He claims that in telephone conversations with Adams in the summer of 1985 (and subsequently), he received assurances that the copyright notice in *Ms. Mystic* No. 1 was a mistake. He also relies on the fact that he was overseas from 1981 to 1990, and only learned of Adams' later exploitation of Ms. Mystic and claims of sole ownership when he returned to the United States in 1990. Finally, he contends that his fear that Adams could ruin his career justified his delay in bringing of suit until he could accumulate more evidence to support his claims.

■ Netzer's contentions will be construed as an argument that the doctrines of equitable estoppel or equitable tolling should suspend the running of the limitations period. Under "extraordinary circumstances" these doctrines can excuse a claimant's failure to comply with the applicable statute of limitations. *See Levy v. Aaron Faber, Inc.,* 148 F.R.D. 114, 119 (S.D.N.Y.1993).

On a motion for summary judgment, "the burden is on the plaintiff to present facts which, if true, justify equitably estopping a defendant from asserting the statute of limitations." *Miller v. United States,* 803 F.Supp. 1120,1127 (E.D.Va.1992).

■ Equitable estoppel may toll a statute of limitations where the plaintiff knew of the existence of his cause of action, but the defendant's misconduct caused him to delay in bringing suit. *Buttry v. General Signal Corp.,* 68 F.3d 1488, 1493 (2d Cir.1995). Ordinarily the doctrine applies where, although the plaintiff is aware of his cause of action, his delay is excused because either the defendant misrepresented the length of the limitations period or "lulled the plaintiff into believing it was not necessary to commence the litigation." *Cerbone v. ILGWU,* 768 F.2d 45,

50 (2d Cir.1985); *see also Green v. Citibank, N.A.,* No. 95 Civ. 1251, 1997 WL 43619 at *5 (S.D.N.Y. Feb. 4, 1997). Equitable estoppel is applicable only in situations where demonstrated "egregious wrongdoing" by a defendant prevents a plaintiff from bringing suit on a claim of which the plaintiff is aware. *See Miller,* 803 F.Supp. at 1128.

Under the equitable tolling doctrine, on the other hand, a statute of limitations does not run against a plaintiff who was justifiably ignorant of his cause of action. *Dillman v. Combustion Engineering, Inc.,* 784 F.2d 57, 60 (2d Cir.1986).

■ A plaintiff seeking to invoke either doctrine is also required to demonstrate that his ignorance is not attributable to a lack of diligence on his part. *Levy,* 148 F.R.D. at 119. A plaintiff who unreasonably relies on the reassurances of a wrongdoer has not satisfied this obligation of due diligence. *See Zola v. Gordon,* 685 F.Supp. 354, 366 (S.D.N.Y.1988) (rejecting plaintiffs' tolling argument because, *inter alia,* "as a matter of law plaintiffs would not be entitled to rely on 'reassuring comments' given them after they received constructive knowledge of the fraud"), *citing Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1416 (9th Cir.1987).

■ Adams' representation that the copyright and authorship attributions in *Ms. Mystic* No. 1 were a "mistake" might be construed as "fraudulent concealment" of the violation of Netzer's co-authorship rights. Fraudulent concealment on the part of the defendant is one ground for invoking equitable estoppel. *See Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 451 (7th Cir.1990). A plaintiff seeking to avoid the bar of limitations has the burden of both pleading and ultimately proving fraudulent concealment. *See Kozonasky v. Sears Roebuck & Co.,* No. 81 Civ. 2164, 1986 WL 12528, *2 (S.D.N.Y. Oct. 27, 1986). The burden of demonstrating the exercise of due diligence is on the plaintiff. *See Levy,* 148 F.R.D. at 120.

■ Here, while Netzer may have produced sufficient evidence to create a genuine issue of fact as to the existence of fraudulent concealment, no reasonable jury could find

that he exercised due diligence in ascertaining the facts that underlie his claim, and thus the statute of limitations would not be tolled by Adams' alleged misrepresentation. According to Netzer's deposition testimony, he had no contacts with the United States between the initial telephone call with Adams in 1985 until early 1990. This testimony indicates that he made no further inquiries into the exploitation of Ms. Mystic after the initial conversation with Adams. His decision to rely on a single denial of wrongdoing by Adams is insufficient to discharge the duty of diligence. *See Singletary v. Continental Illinois Nat'l Bank & Trust Co.*, 9 F.3d 1236, 1241 (7th Cir.1993) ("mere denial of liability ... cannot be a foundation of an equitable estoppel").

In his papers in opposition to Defendants' motion, Netzer submitted an affidavit indicating that there were two further contacts with Continuity or Adams that he had not remembered at the time of his deposition. However, even if Netzer received further reassurances from Adams or Continuity in these conversations, such reassurances are insufficient to satisfy his obligation of due diligence. "[D]ue diligence is not satisfied by continued, passive reliance upon the alleged practitioners of fraud." *Gilck v. Berk & Michaels, P.C.*, No. 90 Civ. 4230, 1992 WL 178621, *3, Fed. Sec. L. Rep. (CCH) ¶ 96,947 at 94,029 (S.D.N.Y.1992).

Had Netzer exercised diligence in ascertaining the facts related to his claim, he would have discovered that Adams had published *Ms. Mystic* No. 2, again claiming sole authorship and copyright ownership, in February 1984, contrary to his 1985 representation that the attribution in *Ms. Mystic* No. 1 was a mistake. The inside front cover of *Ms. Mystic* No. 1 announces a forthcoming issue of *Ms. Mystic* which should have put Netzer on notice that he should obtain and inspect future issues to ensure that the copyright and authorship notices were correct. The fact that he obtained a copy of *Ms. Mystic* No.1 demonstrates that he had the means to obtain copies of subsequent editions while he was out of the United States. Because he failed to do so, he cannot meet his burden of demonstrating that he used due diligence in investigating his claim.

■ With respect to Netzer's absence from the United States, such absence does not excuse his failure to investigate his claims with diligence once he had become aware of Adams' sole authorship claim in 1984. While a *defendant's* absence from the jurisdiction may toll the running of a limitations period, *see* N.Y. CPLR § 207, a *plaintiff's* absence does not excuse failure to file a suit in a timely fashion. Netzer's absence may have justified his initial ignorance of his claim, but once he received a copy of *Ms. Mystic* No. 1, he was on notice of the violation of his rights under the copyright laws and had a duty to use due diligence to investigate that apparent violation. He failed to use the means at his disposal to investigate Adams' use of the Ms. Mystic property, and thus may not invoke the benefits of equitable doctrines tolling the running of the limitations period on his claims.

■ Moreover, even assuming that Netzer had demonstrated diligence in investigating his copyright claim, the claim would be time barred. The running of a limitations period will be tolled only so long as the condition giving rise to the tolling persists. When a time bar has been suspended and then begins to run again upon the occurrence of a later event, the time remaining under the statute is calculated by subtracting from the full limitations period whatever time ran before the tolling commenced. *See United States v. Ibarra*, 502 U.S. 1, 4 n. 2, 112 S.Ct. 4, 5 n. 2, 116 L.Ed.2d 1 (1991); *Benge v. United States*, 17 F.3d 1286, 1288 (10th Cir. 1994) (" 'Equitable tolling' of a statute means only that the running of the statute is suspended, not that the limitations period begins over again.").

Netzer first learned of Adams' claim of sole ownership of the Ms. Mystic copyright in the summer of 1984, when he received a copy of *Ms. Mystic* No. 1. Netzer's claim accrued on this date. Assuming that Adams misrepresented that the copyright attribution was a mistake and that, given his absence from the country, Netzer's limited follow-up constituted an exercise of due diligence in ascertaining whether his rights were being violated,

the running of the limitations period would have been tolled in mid–1985, after at least six months of the period had already elapsed. Thus, a maximum of thirty months of the limitations period remained at the time of tolling. Netzer returned to the United States and visited Continuity in May 1990, where he saw a drawing of Ms. Mystic on a conference room door. By August of 1990, a month after he began working for Adams again, he admits that he learned of further publications of Ms. Mystic, of which he had been previously unaware. At this point, the limitations period began running again and expired no more than thirty months later, in February 1993. This action was not commenced until August 20, 1993, six months after the limitations period elapsed.

■ However, Netzer contends that, at the time he discovered the extent of the Defendants' exploitation of Ms. Mystic, he was concerned that a suit against Adams would harm his career and reputation, and that this fear justified waiting to bring suit until he discovered the "smoking gun" evidence of the joint copyright attribution in the *New Heroes` Portfolio*. This argument essentially concedes that he knew as of August 1990 that he had a cause of action to pursue. Thus, the equitable estoppel doctrine, as opposed to the equitable tolling doctrine, applies to the contention that the running of the limitations period should be tolled even after Netzer discovered the full extent of the Defendants' exploitation of Ms. Mystic.

Netzer's concerns about his career, however, are not sufficient to invoke equitable estoppel. First, Netzer's allegations do not present the usual case in which a defendant has misrepresented the length of the limitations period or given false assurances to "lull" the plaintiff into believing that there is no need to commence an action. Moreover, there must be egregious misconduct on the part of the defendant to warrant estopping an assertion of a limitations defense. *Miller*, 803 F.Supp. at 1128. Although there is some evidence that Adams told Netzer that "negative things" would happen if he pursued his claims regarding Ms. Mystic, there is no evidence of overt threats to Netzer's career or threats of physical harm such as might

give rise to tolling on grounds of duress. Adams' statements do not constitute sufficiently egregious conduct to warrant invocation of equitable estoppel because a reasonable plaintiff would not be deterred from asserting his rights based on such statements.

More significantly, "[f]ear of harm to a plaintiff's career cannot justify equitably estopping a defendant from asserting a time limitation period." *Miller*, 803 F.Supp. at 1128. If career concerns could justify delays in the filing of lawsuits, the benefits of statutes of limitations would be undermined, since revelations made during litigation and the reputation for litigiousness that may attach to a person who brings a lawsuit always have the potential to adversely affect a career.

"Statutes of limitations are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application. They protect important social interests in certainty, accuracy, and repose.... We should not trivialize the statute of limitations by promiscuous application of tolling doctrines." *Cada*, 920 F.2d at 452–53. This is especially true in the area of copyright, where certainty and repose are essential to the functioning of the copyright market. *See Merchant*, 92 F.3d at 57. The copyright laws are designed to enhance the predictability and certainty of copyright ownership. *See Community for Creative Non-Violence*, 490 U.S. at 749, 109 S.Ct. at 2177–78. Such certainty permits individuals to invest in the publication of copyrighted material without undue fear of litigation, and thus serves the ultimate purpose of copyright, which is "enriching the general public through access to creative works." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527, 114 S.Ct. 1023, 1030, 127 L.Ed.2d 455 (1994). "It is inequitable to allow the putative co-owner to lie in the weeds for years after his claim has been repudiated while large amounts of money are spent developing a market for the copyrighted material." *See Zuill v. Shanahan*, 80 F.3d 1366, 1370–71 (9th Cir.1996). Netzer's amorphous concerns about his job prospects in the comic book industry, and his related desire to accumulate "smoking gun"

evidence before litigation, are insufficient to warrant tolling the limitations period and undermining settled expectations and investments made by the Defendants.

Accordingly, Netzer's copyright claims will be dismissed as barred by the statute of limitations.

### B. *The Remaining Ms. Mystic Claims*

Netzer's other claims related to the Defendants' exploitation of Ms. Mystic are addressed below.

### 1. *Counts One and Two*

█ Under New York law, claims of fraud must be brought within two years of the time plaintiff discovered or could with reasonable diligence have discovered the fraud, or within six years of the time the fraud is committed, whichever is later. *See D'Angelo v. City of New York*, 929 F.Supp. 129, 133 (S.D.N.Y.1996), *citing Baratta v. ABF Real Estate Co., Inc.*, 215 A.D.2d 518, 627 N.Y.S.2d 52 (2d Dept.1995); *Ghandour v. Shearson Lehman Bros., Inc.*, 213 A.D.2d 304, 624 N.Y.S.2d 390, 391 (1st Dept.1995); N.Y. CPLR §§ 213(8) & 203(g).

█ Count one alleges that Defendants "defraud[ed] Netzer out of his rights, title and ownership interest, as well as profits, of Ms. Mystic and her supporting characters." This claim is time barred. The only allegations that could support a fraud claim related to profits occurred in the summer of 1985, when Adams told Netzer that there were no profits from Ms. Mystic and that the copyright attribution in *Ms. Mystic* No. 1 was a mistake. The six year period from the time of the fraud would thus expire in 1991, two years before Netzer brought his action. Netzer discovered the fraud no later than August 1990, and under the discovery rule had only until August of 1992 to bring the fraud claim, over one year before he brought this action.

█ Count two alleges that the Defendants "fraudulently induced Netzer into entering the express oral contract, understanding and agreement regarding the ownership, rights, title and interest of Ms. Mystic and her supporting characters." This claim is apparently based on allegations that Adams procured Netzer's agreement to co-author Ms. Mystic by promising that he would get DC Comics to publish it. This alleged fraud took place in 1977. According to Netzer, Adams told him later in 1977 that Ms. Mystic would not be published, thus alerting him to the existence of any fraud in the inducement more than 16 years before he filed this complaint.

Accordingly, counts one and two will be dismissed as barred by the statute of limitations.

### 2. *Counts Three and Four*

Count three alleges that the Defendants "breached their express oral contract" with respect to ownership of the Ms. Mystic property. Netzer appears to base this claim on one of two theories: (1) that Adams promised to use his best efforts to have Ms. Mystic published; or (2) that Adams promised not to exploit Ms. Mystic without obtaining Netzer's consent, sharing any profits and crediting Netzer with co-authorship.

█ This claim too is time barred. A contract action must be commenced within six years of the breach. N.Y. CPLR 213(2). Adams breached any agreement to use his best efforts to have Ms. Mystic published when, as Netzer testified at his deposition, the project was shelved in December 1977 because of personal problems Adams was having with management at DC Comics. According to Netzer's own testimony, he was aware that Ms. Mystic had been shelved, and thus that Adams had breached his agreement to seek publication, in 1977.

█ Adams breached any agreement to consult with Netzer before exploiting the Ms. Mystic property by publishing *Ms. Mystic* No. 1 in 1982. Netzer became aware of this breach in 1984. Although Adams may have concealed profits or his future intentions for Ms. Mystic at that time, he did not, and could not, conceal the fact that he had breached the alleged contract by publishing *Ms. Mystic* No. 1 without Netzer's permission. Thus, there is no basis for tolling the limitations period. The limitations period for the first alleged agreement expired in 1983, and the

period on the second expired no later than 1990.

Count four alleges breach of warranty, apparently in connection with the same promises that form the basis for the breach of contract action. As with the breach of contract action, a warranty action is barred by the six-year statute of limitations. *Verra v. Koluksuz,* 74 A.D.2d 932, 426 N.Y.S.2d 151, 152 (3d Dept.1980).

Accordingly, Counts three and four will be dismissed.

### 3. *Count Five*

■ Count five alleges that Defendants' "statements and representations" during various meetings with Netzer constituted "implied warranties" with respect to the agreement between the parties. Netzer has not specified what the Defendants impliedly warranted. He has not provided any support for a cause of action for breach of implied warranty in the type of contract alleged here. In fact, New York courts are reluctant to read implied warranties into contracts outside of the sale of goods area. *See Milau Assocs., Inc. v. North Ave. Dev. Corp.,* 42 N.Y.2d 482, 486–88, 398 N.Y.S.2d 882, 368 N.E.2d 1247 (1977) (declining to impose UCC's implied warranty of fitness on construction contract). Moreover, implied warranties are warranties imposed by law, not express contractual language. Netzer's claim that "statements and representations" made to him constituted "implied warranties" contradicts the very notion of implied warranties, which arise by operation of law, not by expressions of the parties. It appears that Netzer's implied warranty claim is really nothing more than a restatement of his contract and express warranty claims, and is, as those claims, time barred.

Accordingly, Netzer's implied warranty claim will be dismissed.

### 4. *Count Six*

Count six alleges "negligent performance" of the oral contract regarding ownership of Ms. Mystic.

■ Under certain circumstances, a contractual party may be liable in tort if its defective performance of contractual services results in injury to the person or property of the other contractual party. *See Niagara Mohawk Power Corp. v. Stone & Webster Engineering Corp.,* 725 F.Supp. 656, 661 (N.D.N.Y.1989). For claims alleging only economic loss, however, the usual means of redress is an action for breach of contract; a tort action for economic loss will not lie. *See id.* at 665, *citing Long Island Lighting Co. v. Transamerica Delaval,* 646 F.Supp. 1442, 1457 (S.D.N.Y.1986).

Moreover, "[a]s a general rule ... the breach of a contract is not actionable in tort in the absence of special additional allegations which amount to 'a breach of a duty distinct from, or in addition to, the breach of a contract.'" *Niagara Mohawk,* 725 F.Supp. at 662, *quoting North Shore Bottling Co., Inc. v. C. Schmidt & Sons, Inc.,* 22 N.Y.2d 171, 179, 292 N.Y.S.2d 86, 239 N.E.2d 189 (1968). "[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark–Fitzpatrick v. Long Island Rail Road Co.,* 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987).

■ Here, Netzer's action seeks recovery for economic loss, not for injury to his person or damage to his property, and thus Netzer has no tort action relating to the performance of the alleged contract. *See AT & T v. New York City Human Resources Admin.,* 833 F.Supp. 962, 985 (S.D.N.Y.1993); *Board of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley,* 71 N.Y.2d 21, 29, 523 N.Y.S.2d 475, 517 N.E.2d 1360 (1987).

Moreover, Netzer does not present facts from which a reasonable fact-finder could determine that the alleged "negligent performance" of the contract differs from the alleged breach of contract. The only duties independent of the contract that appear to have been violated are duties imposed by copyright law, not by tort or other sources of law. Netzer will not be permitted to convert his time-barred copyright and contract claims into a tort action by dressing it up as negligent performance of an oral agreement.

Accordingly, the negligent performance claim will be dismissed.

### 5. *Count Seven*

Netzer's seventh cause of action, captioned "Negligent and/or Reckless Errors and Omissions," alleges that the relationships between the Defendants and Netzer gave rise to a "duty to make certain disclosures" to Netzer regarding their intentions to commercially exploit Ms. Mystic, and that Defendants breached that duty by failing to disclose or erroneously disclosing information about the exploitation of Ms. Mystic. Based on the facts before the court, the only bases for the alleged duties would be the alleged oral agreement, Netzer's status as a co-author under the copyright laws, or a fiduciary relationship arising out of a purported partnership between Netzer and Adams. The potential breach of the fiduciary relationship is discussed at II.B.7. below. Aside from the possibility of a fiduciary duty, then, the alleged breach would be either a breach of the contract to consult Netzer or a breach of the duty to account for profits to the copyright's co-owner, *see Weissmann*, 868 F.2d at 1318, claims which are both time barred, as discussed above.

Accordingly, Count seven will be dismissed.

### 6. *Counts Eight and Twelve*

■ Netzer's eighth cause of action alleges that Defendants had a "quasi-contractual role to act in best interests, and to protect the rights, of Netzer regarding" the exploitation of Ms. Mystic. The twelfth cause of action alleges "unjust enrichment." These two theories will be addressed together, because the quasi-contract theory provides a remedy for a claim of unjust enrichment. *See Strauss v. The Hearst Corp.*, 8 U.S.P.Q.2d 1832, 1839, 1988 WL 18932 (S.D.N.Y.1988).

■ "A 'quasi contract' only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." *Clark–Fitzpatrick*, 70 N.Y.2d at 388, 521 N.Y.S.2d 653, 516

N.E.2d 190. The existence of a valid contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events rising out of the same subject matter. *Id.* To the extent that Netzer has established the existence of a valid contract governing the exploitation of Ms. Mystic, his remedy is a contract remedy, which is barred by the statute of limitations.

■ Even if there is no valid contract governing the subject matter of Netzer's claims, there is no factual basis for imposing a quasi-contractual obligation to act in Netzer's best interests in this case. A "quasi-contract" ordinarily arises where a defendant has been unjustly enriched at the expense of a plaintiff; in such a situation, the plaintiff may maintain a claim in quasi-contract (or quantum meruit) for relief. *See S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Building*, 608 F.2d 28, 37 (2d Cir.1979). Thus, an assessment of the quasi-contract claim leads to an analysis of the unjust enrichment claim.

Count twelve of Netzer's complaint alleges "unjust enrichment" based on Defendants' unauthorized exploitation of Ms. Mystic. On this cause of action, Netzer seeks an accounting of profits generated by Ms. Mystic and the increased value of the Defendants' publishing activity resulting from the exploitation of Ms. Mystic.

■ To make out a claim for unjust enrichment under New York law, a plaintiff "must prove that the defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should compensate the plaintiff." *Strauss*, 8 U.S.P.Q.2d at 1839–40, *citing Dolmetta v. Uintah National Corp.*, 712 F.2d 15, 20 (2d Cir.1983).

However, the Copyright Act preempts a state cause of action if the subject matter of the state law right falls within the subject matter of federal copyright law and the state law rights are equivalent to the rights federal copyright law protects. *See Computer Associates Int'l, Inc. v. Altai*, 982 F.2d 693, 716 (2d Cir.1992); *Patrick v. Francis*, 887 F.Supp. 481, 483 (W.D.N.Y.1995).

While Defendants may have been enriched by the exploitation of Ms. Mystic, Netzer's claim of unjust enrichment is preempted by the federal Copyright Act. *See Patrick*, 887 F.Supp. at 484; *Strauss*, 8 U.S.P.Q.2d at 1840. A state law claim whose gravamen is unauthorized publication is preempted by federal Copyright law unless it involves rights that are "different in kind" from those protected by the Copyright statute. *Strauss*, 8 U.S.P.Q.2d at 1838–39. Courts have generally concluded that the theory of unjust enrichment protects rights that are essentially "equivalent" to rights protected by the Copyright Act; thus, unjust enrichment claims relating to the use of copyrighted material are generally preempted. *Id.* at 1840; *Patrick*, 887 F.Supp. at 484; *Universal City Studios, Inc. v. Nintendo Co. Ltd.*, 615 F.Supp. 838, 856–57 (S.D.N.Y.1985), *aff'd* 797 F.2d 70 (2d Cir.1986).

Here, the gravamen of the unjust enrichment claim is unauthorized exploitation of Ms. Mystic without providing an accounting. Any "enrichment" of the Defendants as a result of the exploitation of Ms. Mystic is "unjust" only by virtue of Netzer's co-authorship interest under federal Copyright law, under which he is entitled to an accounting, precisely the remedy he seeks in this claim. Thus, Netzer's unjust enrichment and quasi-contract claims seek vindication for the violation of essentially identical rights and are therefore preempted by Federal Copyright law.

### 7. *Count Nine*

Count nine also purports to impose upon the Defendants the duty to act in Netzer's "best interests." Count nine contends that Defendants had a "common law, statutory and/or fiduciary duty" to Netzer regarding the exploitation of Ms. Mystic. Although Netzer has not identified the source of such a duty, his testimony regarding a conversation proposing a partnership could create a factual issue over the formation of a partnership. If such a partnership were formed, the partners, Netzer and Adams, would be fiduciaries of one another and would owe one another duties of loyalty.

Assuming, *arguendo*, that such a fiduciary relationship existed, Adams' independent exploitation of *Ms. Mystic* in 1982 breached the fiduciary relationship. However, any claim based on this breach is time barred.

Under New York law, the limitations period for a breach of fiduciary duty claim depends on the substantive remedy the plaintiff seeks. See *Merine v. Prudential–Bache Utility Fund, Inc.*, 859 F.Supp. 715, 725 (S.D.N.Y.1994). A request for legal relief for a breach of fiduciary duty is governed by the three year statute of limitations of N.Y. CPLR 214(4), while a request for equitable relief is governed by the six-year residual limitations period prescribed by N.Y. CPLR 213(1). Here Netzer seeks both equitable and legal relief. However, since Netzer failed to bring this action within six years of discovering the breach of fiduciary duty in 1984, and since there is no basis for tolling the limitations period, as discussed above, his breach of fiduciary duty claim is barred by the statute of limitations.

### 8. *Count Ten*

Count ten alleges that the Defendants breached a duty to act in Netzer's best interests arising out of a "duty of good faith and fair dealing." Netzer has not provided this court with a basis for this duty. The only apparent source for such a duty would be the covenant of good faith and fair dealing implied into every contract. *See New York University v. Continental Ins. Co.*, 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995). This claim, then, is essentially the same as the breach of contract claim, and is accordingly time barred.

### 9. *Count Eleven*

Count eleven seeks rescission of the alleged oral agreements. Inasmuch as this count is premised on the alleged breaches of contract discussed above, it is barred by the statute of limitations governing contract actions.

### 10. *Count Thirteen*

Count thirteen alleges interference with Netzer's business affairs. However, claims for tortious interference that are

based on allegations of unauthorized exploitation of copyrighted material are preempted by federal copyright law. *See Harper & Row Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195, 201 (2d Cir.1983) (claim of tortious interference with contract preempted because alleged tort and copyright claim both based on act of unauthorized publication), *rev'd on other grounds,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Accordingly, the tortious interference claim will be dismissed.

### 11. *Count Fourteen*

■ Count Fourteen alleges that the Defendants' activities "constituted violations of General Business Law § 349—New York' s Deceptive Acts & Trade Practices Act." Section 349 is a consumer protection act, designed to "combat ... recurring transactions of a consumer type." *Genesco Entertainment v. Koch,* 593 F.Supp. 743, 752 (S.D.N.Y. 1984) (dismissing claim under § 349). Like the Federal Trade Commission Act on which it was modeled, Section 349 generally prohibits only those deceptive practices affecting the public at large. *Id.* "Private transactions not of a recurring nature or without ramifications for the public at large" do not fall within the purview of section 349.

Here, the incidents of which Netzer complains are not consumer-oriented deceptive practices that have ramifications for the public at large. As in *Genesco,* "[t]he only parties truly affected by the alleged misrepresentations in this case are the plaintiff and the defendants." *Id.* There is no evidence in the record of a pattern of recurring conduct by the Defendants that could deceive consumers at large.

Accordingly, Netzer's claim under N.Y. Gen. Bus. Law § 349 will be dismissed.

### 12. *Count Eighteen*

Count 18, the count asserting the federal copyright claims, also asserts a cause of action for trademark infringement. "To acquire ownership of a trademark, one must actually use the mark in the sale of goods or services." 2 McCarthy on Trademarks § 16.03. Netzer testified at his deposition that he never made any use of the Ms. Mystic trademark. Accordingly, his trademark claim will be dismissed.

Count 18 could also be read to allege misattribution of authorship in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). He claims that by failing to properly credit him for his co-authorship of Ms. Mystic, the Defendants deprived him of the professional recognition and career benefits that would have accrued from proper attribution.

■ A wrongdoer who removes a person's name or mark from a product and then sells that product as his own may violate the Lanham Act; such a practice is known as reverse palming off. *See Merchant v. Lymon,* 828 F.Supp. 1048, 1059 (S.D.N.Y.1993), *rev'd on other grounds sub nom., Merchant v. Levy,* 92 F.3d 51 (2d Cir.1996); *Rosenfeld v. W.B. Saunders, Div. of Harcourt Brace Jovanovich, Inc.,* 728 F.Supp. 236, 241 (S.D.N.Y.), *aff'd,* 923 F.2d 845 (2d Cir.1990).

■ This claim, too, is time barred. Because the Lanham Act establishes no limitations period for unfair competition claims and there is no corresponding federal statute of limitations, a federal court looks to the most appropriate or analogous state statute of limitations. *See Wilson v. Garcia,* 471 U.S. 261, 266–68, 105 S.Ct. 1938, 1941–43, 85 L.Ed.2d 254 (1985). The Second Circuit recently held that the most analogous New York limitations period is the six-year period for fraud claims pursuant to N.Y. CPLR § 213(8). *Conopco, Inc. v. Campbell Soup Co.,* 95 F.3d 187, 191–92 (2d Cir.1996).

The limitations period on Netzer's claim began running in 1984, when he first learned of Adams' misattribution in *Ms. Mystic* No. 1. Since he did not bring his claim within six years and, as discussed above, there are no grounds for tolling the limitations period because of Netzer's lack of diligence, any Lanham Act claims would be time barred.

## III. *The Crazyman Claims*

### A. *The Libel Claim*

■ A plaintiff seeking relief for common law libel in New York must prove that

the defendant made a false and defamatory statement "of and concerning" the plaintiff, with the requisite degree of fault, published that statement to a third party, and caused "special damages" thereby. *See Weinstein v. Friedman,* No. 94 Civ. 6803, 1996 WL 137313, *10 (S.D.N.Y. March 26, 1996), *aff'd,* 112 F.3d 507, 1996 WL 600880 (2d Cir. Oct.17, 1996); *Box Tree South, Ltd. v. Bitterman,* 873 F.Supp. 833, 844 (S.D.N.Y.1995). Certain types of statements, including charges of criminal conduct, that are defamatory *per se* do not require proof of special damages. *Luisi v. JWT Group, Inc.,* 128 Misc.2d 291, 294, 488 N.Y.S.2d 554, 557 (Sup. Ct.1985); *Cornish v. Bennett,* 38 Misc. 688, 78 N.Y.S. 244 (Sup.Ct.1902), *aff'd,* 82 A.D. 636, 81 N.Y.S. 1121 (1st Dept.1903).

■ Defendants contend that, as a matter of law, the use of the Netzer's Names to identify a terrorist in the fantastic setting of the *Crazyman* comic book is not susceptible of a defamatory meaning.[2]

■ Whether a statement is susceptible of a defamatory meaning is a threshold question of law to be resolved by the court. *Aronson v. Wiersma,* 65 N.Y.2d 592, 593, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985); *James v. Gannett Co., Inc.,* 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976). If the statement complained of is susceptible of more than one meaning, at least one of which is defamatory, the claim must go to the jury. *James,* 40 N.Y.2d at 419, 386 N.Y.S.2d 871, 353 N.E.2d 834; *Davis v. Ross,* 754 F.2d 80, 83 (2d Cir.1985).

■ In New York, a statement will be found defamatory only if it "tend[s] to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or to induce an evil opinion of one in the minds of right-thinking persons, and to deprive one of their confidence and friendly intercourse in society." *Fairley v. Peekskill Star Corp.,* 83 A.D.2d 294, 296, 445 N.Y.S.2d 156, 158 (2d Dept.1981). In analyzing the allegedly de-

famatory words, the court is to consider the publication as a whole and test its effect upon the average reader. *James,* 40 N.Y.2d at 419, 386 N.Y.S.2d 871, 353 N.E.2d 834 (citations omitted). An allegedly defamatory statement must be interpreted in the context of the type of publication in which it appears. *See Mullenmeister v. Snap-on Tools Corp.,* 587 F.Supp. 868, 873–75 (S.D.N.Y.1984) (depiction of plaintiff wearing swastika not capable of defamatory meaning because in context of commercial, in-house newsletter, it could only be taken as designation of plaintiff's national origin, not as accusation of Naziism or anti–Semitism). The statement is to be read against the background and circumstances of its publication. *James,* 40 N.Y.2d at 420, 386 N.Y.S.2d 871, 353 N.E.2d 834 (citations omitted).

■ In the context of publications that "plainly involve[ ] humor, fiction and fantasy, or the bizarre," *Frank v. National Broadcasting Co., Inc.,* 119 A.D.2d 252, 261, 506 N.Y.S.2d 869, 875 (2d Dept.1986), a court will consider whether the statements give "rise to an impression that they are true" and whether they were "intended to injure." *Id.* at 257, 506 N.Y.S.2d 869. Although the fictional or humorous nature of a publication will not necessarily insulate it from a libel claim, *Fisher v. Country Wide Publications, Inc.,* 29 Misc.2d 96, 98, 213 N.Y.S.2d 897, 899 (Sup.Ct.1961), if the allegedly defamatory statement could not be "reasonably understood as describing actual facts about the plaintiff or actual events in which [he] participated," the publication will not be libelous. *Pring v. Penthouse Intern., Ltd.,* 695 F.2d 438, 442 (10th Cir.1982); *cf. Silberman v. Georges,* 91 A.D.2d 520, 521, 456 N.Y.S.2d 395, 397 (1st Dept.1982) (finding painting depicting plaintiffs attacking woman non-libelous allegorical expression of opinion, because picture "could not be intended, viewed by any reasonable person, as an accusation by defendant that either plaintiff had actually participated in an assault"); *see also Garvelink v. Detroit News,* 206 Mich.App. 604, 522 N.W.2d 883, 886 (Mich.App.1994) ("state-

---

**2.** Alternatively, Defendants argue that no reasonable jury could conclude that the statements were "of and concerning" Netzer. Because the use of the Names is not susceptible of a defama-

tory meaning, there is no need to reach the question of whether the publication was of or concerning Netzer.

ments [that] cannot reasonably be interpreted as stating actual facts about the individual ... are protected by the First Amendment").

Here, the use of the Names in *Crazyman* No. 3 is not susceptible of a defamatory meaning, because no reasonable reader could understand the comic book as describing actual facts about Netzer or actual events in which he participated. *Pring*, 695 F.2d at 442. *Crazyman* is patently a work of fantasy, involving outlandish plot scenarios and characters with impossible powers. No reasonable reader of such a publication would take the events described as factual events. In a related context, a New York court has observed that cartoons, which are similar to the comic book at issue here, "cannot reasonably be interpreted as 'literally depicting an actual event or situation'." *Velez v. VV Publishing Corp.*, 135 A.D.2d 47, 52, 524 N.Y.S.2d 186, 189 (1st Dept.1988) (rejecting plaintiff's invasion of privacy claim because cartoon balloon in advertisement could not be taken as literal endorsement of publication in violation of N.Y. Civil Rights L. §§ 50–51) (citations omitted). Moreover, *Crazyman* includes a disclaimer stating that "any similarities to real people or places in fiction and semi-fiction is (sic) purely coincidental."

Given the fantastic events and characters depicted in *Crazyman*, no average reader could reasonably conclude that the comic book was somehow a roman à clef that actually charged Netzer with terrorist activities. Thus, the use of the Names could not subject him to "public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace," and is therefore not susceptible of a defamatory meaning.

Netzer contends that some readers in the comic book world who knew of his ethnic and religious background and extended sojourn in the Middle East could conclude that the naming of a fictional terrorist after him was meant as a factual assertion that he was indeed involved in terrorist activities. However, the fact that such "insiders" in the comic book industry might know about Netzer's time in the Middle East is insufficient to confer defamatory meaning on the publication. Although some knowledge of Netzer's

biography would make it more likely that a reader would conclude that the statement was "of or concerning Netzer," it would not make such a reader more likely to take the content to be factual. Moreover, there is no evidence in the record that any reader of *Crazyman* No. 3, insider or otherwise, interpreted it as an assertion that Netzer, as a matter of fact, is or was a terrorist or criminal of any sort.

Accordingly, Netzer's libel claim will be dismissed.

### B. *Privacy Claims*

■ Netzer also claims that his right to privacy has been violated by the use of his name and likeness in *Crazyman* No. 3. "The right to privacy in New York is derived solely from Section 50 and 51 of the New York Civil Rights Law. There is no common law right of privacy in New York." *DeGregorio v. CBS, Inc.*, 123 Misc.2d 491, 492, 473 N.Y.S.2d 922, 923 (Sup.Ct.1984).

Section 50 of the Civil Rights Law makes it a misdemeanor to use "for advertising purposes, or for the purposes of trade, the name portrait or picture of any living person without having first obtained the written consent of such person." Section 51 provides, in pertinent part: "Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as [provided in § 50] may maintain an equitable action ... to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use ... "

Netzer contends that the use of the Names in *Crazyman* No.3 without first obtaining his written consent violated Section 51.

■ However, not every unauthorized use of an individual' s name in connection with trade or advertising violates the statute. *Damron v. Doubleday, Doran & Co.*, 133 Misc. 302, 303, 231 N.Y.S. 444, 445 (Sup.Ct. 1928), *aff'd*, 226 A.D. 796, 234 N.Y.S. 773 (1st Dept.1929), *and aff'd* 226 A.D. 796, 234 N.Y.S. 774 (1st Dept.1929). In determining whether a name or likeness is used primarily for advertising or trade in violation of the

statute, a court will weigh the circumstances of the use, its extent or degree, and the character of the use. *Id.* Courts in New York are reluctant to impose liability under §§ 50–51 for "incidental" use of a person's name or image because of the danger of "impos[ing] an uncalled-for burden and hazard" on publishers. *Id.* *See also Preston v. Martin Bregman Productions, Inc.,* 765 F.Supp. 116, 120 (S.D.N.Y.1991).

Thus, the New York courts have recognized that "incidental use" of a person's name or photograph, even when it is unauthorized and fictionalized, falls outside the prohibition of the statute. *See Ladany v. William Morrow & Co., Inc.,* 465 F.Supp. 870, 880 (S.D.N.Y.1978) (collecting New York cases). This incidental use exemption protects the writers and publishers of books and other materials from liability for "isolated," "fleeting," or "de minimis" uses of a person's name or image. *See University of Notre Dame Du Lac v. Twentieth Century–Fox,* 22 A.D.2d 452, 256 N.Y.S.2d 301, 304 (1st Dept.), *aff'd* 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965) ("isolated references ... of ... fleeting and incidental nature" do not offend Civil Rights Law); *Stillman v. Paramount Pictures Corp.,* 2 A.D.2d 18, 153 N.Y.S.2d 190, 191 (1st Dept.1956), *aff'd* 5 N.Y.2d 994, 184 N.Y.S.2d 856, 157 N.E.2d 728 (1959) (§§ 50–51 "do not prohibit the incidental, momentary and isolated use" of a person's name in a fictional movie); *Man v. Warner Bros., Inc.,* 317 F.Supp. 50, 53 (S.D.N.Y.1970) (incidental use of forty-five seconds of plaintiff's performance in film is "de minimis," and not actionable).

"Whether a use falls within the incidental use exception is determined by the role that the use of the plaintiff's name or likeness plays in the main purpose and subject of the work at issue." *Preston,* 765 F.Supp. 116 at 119. The statute requires a relatively "direct and substantial connection between the appearance of the plaintiff's name or likeness and the main purpose and subject of the work" before liability may be established. *Id.*

Here, the isolated use of Netzer's previous name and his current surname as aliases for the terrorist character in *Crazyman* is insufficient to establish liability. The Names appear in only one of 116 panels in a twenty-four page comic book. Such isolated use of a name is generally not actionable. *See University of Notre Dame Du Lac,* 256 N.Y.S.2d at 303–04 (plaintiff mentioned three times in 143 page book, not actionable); *Ladany,* 465 F.Supp. at 881 (references to plaintiff on 13 of 458 pages not actionable); *Meeropol v. Nizer,* 381 F.Supp. 29, 37–38 (S.D.N.Y.1974) (plaintiffs mentioned 29 times in book not actionable), *aff'd on other grounds,* 560 F.2d 1061 (2d Cir.1977); *Damron,* 231 N.Y.S. at 446 (single use of name in book does not violate statute).

Moreover, the isolated use of the Names has no "direct and substantial connection" to the main subject or purpose of the comic book. The aliases appear incidentally and are inconsequential not only to the overall plot of the comic book, but also to the panel in which they appear. From the perspective of the work taken as a whole, the significant information in the panel that includes the Names is that the terrorist had associated with a primary villain in the *Crazyman* series.

Although the image of the terrorist appears on five pages of the comic book, no reasonable juror could conclude that the terrorist depicted bears any physical resemblance to Netzer. In fact, the character was drawn by a free-lance artist who did not know Netzer. Absent any physical resemblance to Netzer, it cannot be said that the panels in which he is not identified make use of his "likeness" in contravention of the statute.

Accordingly, the invasion of privacy claim will be dismissed.

### C. *Intentional Infliction of Emotional Distress*

Netzer also alleges that the Defendants intentionally inflicted emotional distress upon him by using the Names in *Crazyman* No. 3.

To establish a claim for intentional infliction of emotional distress under New York law, a plaintiff must prove: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and

the injury; and (4) severe emotional distress. *See Howell v. New York Post Co.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699, 702 (1993); *see also Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996).

 Liability for infliction of emotional distress will not attach unless the defendant's conduct was "so shocking and outrageous as to exceed all reasonable bounds of decency," *Fischer v. Maloney,* 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 991–93, 373 N.E.2d 1215, 1216–17 (1978), or be "utterly intolerable in a civilized" society. *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86, 90 (1983). The outrageousness element is susceptible of determination as a matter of law. *Howell,* 81 N.Y.2d at 121, 596 N.Y.S.2d 350, 612 N.E.2d 699.

 The standard of outrageousness is an objective one; even if the defendant is aware of some peculiar susceptibility of the plaintiff to emotional distress, the conduct must still be objectively outrageous to be actionable. *See Nestlerode v. Federal Ins. Co.,* 66 A.D.2d 504, 507, 414 N.Y.S.2d 398 (4th Dept.1979). In *Howell,* the Court of Appeals noted that the requirement of extreme and outrageous conduct is so "rigorous and difficult to satisfy" that "of the intentional infliction of emotional distress claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous." *Howell,* 81 N.Y.2d at 122, 596 N.Y.S.2d 350, 612 N.E.2d 699.

 Defendants contend that the conduct attributed to them is not sufficiently "extreme and outrageous" to make out an action for intentional infliction of emotional distress.

Determining whether conduct is so outrageous as to "exceed all reasonable bounds of decency" or be "utterly intolerable in a civilized society" is a fact-specific inquiry. Some decisions have taken a restrictive approach to this state law tort. *See Leibowitz v. Bank Leumi Trust Co. of N.Y.,* 152 A.D.2d 169, 182, 548 N.Y.S.2d 513 (2d Dept.1989) (use of anti–Semitic slurs not sufficiently outrageous); *Herlihy v. Metropolitan Museum of Art,* 214 A.D.2d 250, 262–63, 633 N.Y.S.2d 106 (1st Dept.1995) (false accusation of using anti–Semitic slurs not sufficiently outrageous); *Andrews v. Bruk,* 220 A.D.2d 376,

631 N.Y.S.2d 771 (2d Dept.1995) (rejecting claim based on use of medical records to allege extramarital affair); *Coliniatis v. Dimas,* 848 F.Supp. 462, 470–71 (S.D.N.Y.1994) (allegations of criminal and fraudulent conduct insufficient to constitute outrageous conduct). These courts have been reluctant to allow recovery "absent a 'deliberate and malicious campaign of harassment or intimidation.'" *Herlihy,* 214 A.D.2d at 263, 633 N.Y.S.2d 106, *quoting Nader v. General Motors Corp.,* 25 N.Y.2d 560, 569, 307 N.Y.S.2d 647, 255 N.E.2d 765 (1970).

Other courts, however, have been more lenient in finding outrageousness. *See Flatley v. Hartmann,* 138 A.D.2d 345, 346, 525 N.Y.S.2d 637, 638 (2d Dept 1988) ("hang-up" telephone calls sufficient); *Halio v. Lurie,* 15 A.D.2d 62, 67, 222 N.Y.S.2d 759, 764 (2d Dept.1961) (taunting letter from former boyfriend, boasting of marriage). These cases, however, have been decided at the pleadings stage.

Here, the use of the Names in connection with a clearly fictional character in a comic book is not objectively so outrageous as to exceed all possible bounds of decency. The use of the Names may have been calculated to hurt Netzer's feelings, and there is some factual basis for concluding that the Defendants used Netzer's names in retaliation for Netzer's assertion of co-ownership in Ms. Mystic. However, these motivations do not make the misconduct itself objectively outrageous. Upon consideration of the affidavits, depositions and other evidence available on this motion, no reasonable jury could conclude that the single use of Netzer's name in *Crazyman* No. 3 amounts to a deliberate or malicious campaign to harass or intimidate.

Accordingly, Defendants' motion to dismiss the intentional infliction of emotional distress claim will be granted.

### Conclusion

For the reasons set forth above, the Defendants' motions are hereby granted in their entirety and Netzer's complaint is dismissed.

It is so ordered.