[633 NYS2d 106]

Cecile Herlihy, Respondent, v Metropolitan Museum of Art, Defendant, and Ruth Zalinka et al., Appellants.

First Department, October 10, 1995

**APPEARANCES OF COUNSEL**

*Anne C. Vladeck* of counsel *(Judith P. Vladeck* and *Edward Hernstadt* on the brief; *Vladeck, Waldman, Elias & Engelhard, P. C.,* attorneys), for respondent.

*Charles H. Kaplan* of counsel *(Elizabeth A. Alcorn* and *Alice B. Stock* on the brief *(Whitman Breed Abbott & Morgan,* attorneys), for appellants.

**OPINION OF THE COURT**

TOM, J.

This appeal raises the issue of whether statements made by

workers to their employer, concerning certain anti-Semitic remarks allegedly made by a supervisor, are privileged communications and therefore, not actionable.

Plaintiff Cecile Herlihy was employed by defendant the Metropolitan Museum of Art (the Museum) for a period of more than 20 years and, at the time in question, was in charge of recruiting and supervising Museum volunteers. The volunteers are utilized in the curatorial and administrative departments as well as in conjunction with the Museum's education department. Defendant Judith Strone began working as a volunteer in September 1971, defendant Sandra Ortner in October 1988, and defendant Ruth Zalinka in June 1990 (the foregoing individuals will be collectively referred to herein as the volunteers or the individual defendants).

In July and August 1991, the volunteers complained to the Museum's Human Resources Office, as well as other officials, that plaintiff had made anti-Semitic remarks to them. Specifically, in July 1991, Zalinka and Ortner reported that plaintiff had said "you Jews are such liars" and "you Jews are all alike." In August 1991, Strone averred that plaintiff had remarked that the Jewish volunteers were "f__king whores", "liars" and "undependable".

After being confronted with the volunteers' charges, plaintiff informed the Museum's officers that she had never made the remarks and that the volunteers' accusations were totally false. Plaintiff further asserted that the defendants were acting to retaliate against plaintiff after she exercised authority over their work schedules, questioned the feasibility of certain work schedule requests around Rosh Hashanah, and issued them reprimands regarding their respective work performances.

The Museum's Manager of Membership, purportedly after conducting some sort of investigation, demanded that Herlihy apologize for her remarks. On or about September 11, 1991, the Museum suspended plaintiff and on or about October 7, 1991, plaintiff was informed she was being terminated. Herlihy maintains that in the interim between her suspension and ultimate discharge, Museum officials inquired if her job was "getting to be too much for her" and that after her discharge, her duties were assigned to two younger, less experienced individuals. Plaintiff was 72 years of age at the time in question.

Plaintiff subsequently commenced the underlying action by

the service of a summons and complaint which interposed five causes of action asserting, respectively: slander per se as against the volunteer defendants; slander with allegations of special damages as against the volunteer defendants; discrimination against plaintiff on the basis of her age in violation of the Human Rights Law as against the Museum; tortious interference with plaintiff's business relations with the Museum as against the volunteer defendants; and intentional infliction of emotional distress as against all of the defendants.

The individual defendants moved to dismiss the complaint pursuant to CPLR 3211 (a) (7) and/or for summary judgment pursuant to CPLR 3212, asserting that plaintiff's action against them amounts to unlawful retaliation for having engaged in their statutorily protected right to be free from discrimination. The Museum, as part of the same motion, moved to dismiss with regard to the intentional infliction of emotional distress cause of action only. The IAS Court treated the motion as one for summary judgment pursuant to CPLR 3211 (c) and granted the Museum the relief sought but denied that branch of the motion pertaining to the volunteers in its entirety. The individual defendants now appeal.

██ Initially we find that the IAS Court did not abuse its discretion and properly treated the motion as one for summary judgment as all of the parties laid bare their proof and submitted extensive affidavits, giving plaintiff a sufficient opportunity to make an appropriate record. It is, therefore, clear that both sides deliberately charted a summary judgment course (Mihlovan v Grozavu, 72 NY2d 506; Four Seasons Hotels v Vinnik, 127 AD2d 310).

Defendants argue with regard to the slander and slander per se causes of action that State, Federal and local antidiscrimination statutes confer privileges which render them absolutely immune from retaliation for lodging a discrimination complaint. Alternatively, defendants assert that their statements were protected by a cloak of absolute and qualified privilege.

The first issue to be addressed is the balance between the need for protecting society's interest in maintaining a discrimination-free workforce and an aggrieved party's right to protect his/her good reputation and standing among his/her peers. It has long been recognized by the courts that the public interest is served by shielding certain communications from litigation, though possibly defamatory, rather than risk

stifling them completely *(Liberman v Gelstein,* 80 NY2d 429, 437; *Bingham v Gaynor,* 203 NY 27, 31).

It is clear that numerous Federal, State and local statutes expressly exist to encourage victims of workplace discrimination to come forward and report discriminatory incidents and, at the same time, impose upon employers a corresponding duty to investigate those complaints and, if appropriate, take necessary action *(see, e.g.,* 42 USC §§ 2000a-2, 2000e-3 [a]; Executive Law § 296 [7]; Administrative Code of City of NY § 8-107 [7]). Retaliation by employers against individuals for complaining of or opposing actions that they believe are discriminatory is illegal and employers can be held liable for tolerating discriminatory behavior (Executive Law § 296 [1] [e]; [3-a] [c]).[1]

In *Matter of Mohawk Finishing Prods. v State Div. of Human Rights* (57 NY2d 892), however, the Court of Appeals rejected the notion of an absolute bar against retaliation for an unfounded complaint of discriminatory practices. In *Mohawk,* the Court affirmed the Third Department's annulment of a determination of discriminatory practices by the Human Rights Appeal Board, finding that there was insufficient evidence to satisfy either the Federal standard that a complainant must have a reasonable belief that her employer was engaging in discriminatory practices, or the more stringent standard set forth by the Third Department that the employer's practice did, in fact, violate the Human Rights Law.

In *Mohawk,* however, the Court of Appeals, despite the opportunity, failed to specifically adopt either the Third Department or Federal standard.[2] As a result, the Third Department, "[u]pon reflection", concluded in a later case that the more relaxed "reasonable belief standard" was appropriate in view of the remedial nature of the Human Rights Law and an explicit statutory admonition to construe the statute liberally *(Matter of New York State Off. of Mental Retardation & Dev. Disabilities v New York State Div. of Human Rights,* 164 AD2d 208, 210).

The majority of cases relied upon by defendants in support

1. These laws enable workers to feel secure in their work environment by providing protection from retaliatory measures taken or encouraged by the targets of their complaint. Without such protections, a workforce free of discrimination is merely an illusory promise.

2. See, for a more detailed discussion, Lanzarone, Labor Relations Law, 35 Syracuse L Rev 459, 462 (1984).

of their claim of an absolute statutory privilege base such privilege on the existence of a quasi-judicial proceeding, which did not occur in the matter before us. For instance, in *Proulx v Citibank* (659 F Supp 972), the court found that even where an employee concedes that his complaint was malicious and unfounded, he was protected from discharge pending the filing and resolution of his complaint with the appropriate agency. The court, however, did not conclude that title VII of the Civil Rights Act barred a subsequent defamation claim, stating: "It does not follow that an employer made the object of a malicious discrimination claim is necessarily without legal remedy. * * * The employer's remedy is to defeat the employee's claim on its merits * * * and then * * * attempt a suit against the employee for defamation." *(Supra,* at 978-979; *accord, Pettway v American Cast Iron Pipe Co.,* 411 F2d 998, 1007, n 22 [in which the Fifth Circuit Court of Appeals held that "We in no way imply that an employer is preempted by Section 704 (a) from vindicating his reputation through resort to a civil action for malicious defamation. * * * An employer, consistent with the language and the intent of Title VII, simply cannot avail himself of the retributive discharge"]; *Linn v Plant Guard Workers,* 383 US 53, 63 [in the context of union organizing activity, the National Labor Relations Act does not bar State defamation claims as "it must be emphasized that malicious libel enjoys no constitutional protection in any context."]).

■ Accordingly, we conclude that statutory provisions prohibiting retaliatory conduct do not confer, upon bad-faith complainants making false discriminatory-related charges, absolute immunity from defamation actions that may arise out of those charges.

Alternatively, defendants assert that common-law privilege absolutely protects them from defamation suits, without regard to Federal, State and local antidiscrimination statutes. This argument is untenable.

Public policy mandates that certain forms of communication, although defamatory, cannot serve as a basis for liability in a defamation action *(Toker v Pollak,* 44 NY2d 211, 218; *Shenkman v O'Malley,* 2 AD2d 567, 572) and these communications are deemed either absolutely or qualifiedly privileged *(Toker v Pollak, supra,* at 219). "Absolute privilege is an ancient doctrine. Long recognized by English law as a means to protect freedom of speech and deliberation in Parliament, it was later embodied in American Constitutions, including that of New York State (NY Const, art III, § 11), so that our

legislators would enjoy an uninhibited range of freedom to propose, oppose, debate, adopt or reject ideas as precursors to legislative action * * *. By a parallel development in the judicial sphere it has served to bolster our Judges' freedom to act without fear or favor in the furtherance of a 'vigorous and independent administration of justice' *(Yates v Lansing,* 5 Johns 282, 292 [KENT, Ch. J.], affd 9 Johns 395)." *(Stukuls v State of New York,* 42 NY2d 272, 275.)

Communications which are afforded an absolute privilege are cloaked with an immunity which is stringently applied, and which protects communications irrespective of the communicant's motives *(Park Knoll Assocs. v Schmidt,* 59 NY2d 205; *Toker v Pollak, supra,* at 219; Prosser, Torts, § 114, n 66 [4th ed]). Such privilege is granted only to those individuals participating in a judicial, legislative or executive function and is based upon the personal position or status of the speaker *(600 W. 115th St. Corp. v Von Gutfeld,* 80 NY2d 130, 135, *cert denied* — US —, 113 S Ct 2341; *Toker v Pollak, supra,* at 219).

In *600 W. 115th St. Corp.,* the Court of Appeals concluded that a private citizen speaking at a public hearing was not conferred with absolute privilege because, unlike members of the Community Board, the defendant had no office at the hearing *(see also, Park Knoll Assocs. v Schmidt, supra* [where the Court of Appeals held that the leader of a community group did not enjoy an absolute privilege in assisting group members to register an official complaint]).

In the matter before us, defendants were not conferred with an absolute privilege as they did not make their statements in an official capacity while discharging a governmental duty, nor were the statements made during, or for, judicial, quasi-judicial or administrative hearings *(see, Missick v Big V Supermarkets,* 115 AD2d 808, *appeal dismissed* 67 NY2d 938).

Defendants also argue that their statements to Museum officials are protected by a qualified privilege. Under New York law, "communications protected by a qualified privilege do not provide the communicant with an immunity against the imposition of liability in a defamation action" *(Toker v Pollak, supra,* at 219). Rather, good-faith communications by a party having an interest in a subject, or a moral or societal duty to speak, are protected by a qualified privilege if made to a party having a corresponding interest *(Byam v Collins,* 111 NY 143, 150; *Buckley v Litman,* 57 NY2d 516, 518-519; *Bald-*

*win v Shell Oil Co.,* 71 AD2d 907, 910; *Jung Hee Lee Han v State of New York,* 186 AD2d 536, 537; *Van Wyck v Aspinwall,* 17 NY 190, 193). Indeed, the application of qualified privilege is not restricted within the narrow limits of absolute privilege but, rather, its application is widespread *(Garson v Hendlin,* 141 AD2d 55, 60, *lv denied* 74 NY2d 603; 44 NY Jur 2d, Defamation and Privacy, § 76, at 41 [1985 ed]).

Some examples of such a common interest warranting a qualified privilege have been found to exist between the employees of an organization or business entity *(Loughry v Lincoln First Bank,* 67 NY2d 369), members of a faculty tenure committee *(Stukuls v State of New York, supra),* the constituent physicians in a health care plan *(Shapiro v Health Ins. Plan,* 7 NY2d 56), tenant association members of an apartment complex *(Liberman v Gelstein, supra),* the head of New York State school for deaf mutes *(Hemmens v Nelson,* 138 NY 517, 523), and to employees, as distinguished from board members, of a board of education *(Green v Kinsella,* 36 AD2d 677). The underlying rationale behind a qualified privilege is that "so long as the privilege is not abused, the flow of information between parties sharing a common interest should not be impeded" *(Liberman v Gelstein, supra,* at 437). In view of the parameters of this form of privilege, we find that the individual defendants were cloaked with a qualified privilege.

A qualified privilege, however, is "conditioned on its proper exercise, and cannot shelter statements published with malice or with knowledge of their falsity or reckless disregard as to their truth or falsity" *(Loughry v Lincoln First Bank, supra,* at 376; *O'Rorke v Carpenter,* 55 NY2d 798, 799; *Stillman v Ford,* 22 NY2d 48, 53; Prosser and Keeton, Torts § 115, at 833-835 [5th ed]). In order to satisfy the malice requirement, plaintiff must demonstrate that the communication involved is consistent with a desire to injure the targeted individual to justify submitting the question of malice to the jury *(Garson v Hendlin, supra,* at 64; *Stukuls v State of New York, supra,* at 279; *Shapiro v Health Ins. Plan, supra,* at 61; *Kadish v Dressner,* 86 AD2d 622). Malice has been defined as " 'personal spite or ill will, or culpable recklessness or negligence' " *(Hoeppner v Dunkirk Print. Co.,* 254 NY 95, 106, quoting *Cherry v Des Moines Leader,* 114 Iowa 298, 300, 86 NW 323); and may be inferred from a defendant's use of expressions beyond those necessary for the purpose of the privileged communication *(Mellen v Athens Hotel Co.,* 153 App

Div 891), or from a statement that is "so extravagant in its denunciations or so vituperative in its character" *(Ashcroft v Hammond,* 197 NY 488, 496) as to warrant an inference of malice.

In the matter at hand, plaintiff is alleged to have made certain anti-Semitic remarks which disparaged all Jews and which, if attributed to her, would subject her to the scorn and contempt of the community. This is not a situation where defendants could have mistakenly attributed the statements to plaintiff, they were reported as the product of first-hand knowledge. Simply, defendants assert that plaintiff made the comments, and plaintiff asserts she did not and that defendants have accused her in order to injure her for certain supervisory decisions which she made against them. There can be no dispute that if these alleged statements were false, defendants' allegations to the Museum's supervisors could well be determined, by a trier of fact, to have been made solely to harm plaintiff.

 In view of the foregoing, we conclude, as did the IAS Court, that an issue of fact exists concerning whether defendants' allegations were made with malice or ill will, thereby precluding summary judgment *(see generally, Liberman v Gelstein, supra; Toker v Pollak, supra; Vacca v General Elec. Credit Corp.,* 88 AD2d 740; *Scott v Cooper,* 215 AD2d 368). Since, as in the second cause of action, the slander is not defamatory per se, special damages must be pleaded *(Christopher Lisa Matthew Policano, Inc. v North Am. Precis Syndicate,* 129 AD2d 488, 490; *Wehringer v Allen-Stevenson School,* 46 AD2d 641, *affd* 37 NY2d 864, *cert denied* 424 US 924). Plaintiff herein has satisfied that requirement by specifically pleading pecuniary damages arising from the loss of her employment.

██ Defendants' argument that the defamation claims should be dismissed because the complaint does not state the names of the persons to whom the defendants allegedly made the defamatory remarks is without merit. A complaint is valid on its face if it gives both the court and the defendants adequate notice of the various transactions and occurrences by which plaintiff intends to prove that the remarks made by the defendants are attributable to those parties *(Taub v Amana Imports,* 140 AD2d 687, 689; *Langenbacher Co. v Tolksdorf,* 199 AD2d 64).

Plaintiff herein specifically alleges that defendants made the

defamatory statements on July 31, 1991 to the Museum's Manager of Membership, Barbara Dougherty, and to Museum Human Resources Officers Saldok and Cantrell. The complaint also sets forth the time period in which the statements were made, specifically, in or about July and August 1991. Thus, the complaint, as corroborated by affidavits, more than adequately describes the circumstances of the publication at issue.

■ We also reject defendants' assertion that the complaint should be dismissed in its entirety as against Strone because she never made any of the alleged accusations. While Strone denies making the statements, such denial only creates additional questions of fact for the jury in light of the evidence presented. This is particularly true where, as here, Museum Officer Cantrell informed plaintiff that Strone had, in fact, made the accusations.

■ Plaintiff has also properly set forth a cause of action for slander per se. Words which have a tendency to disparage an individual, *inter alia,* in the way of her office, profession, trade or business are slanderous per se *(Nichols v Item Publs.,* 309 NY 596, 600-601; *Liberman v Gelstein, supra,* at 435; *Warlock Enters. v City Ctr. Assocs.,* 204 AD2d 438; *DeBlasio v North Shore Univ. Hosp.,* 213 AD2d 584; Restatement [Second] of Torts §§ 570-573). The words should be considered in the context in which they were used and whether they can be readily interpreted as imparting to plaintiff "fraud, dishonesty, misconduct or unfitness in [her] business" *(Vacca v General Elec. Credit Corp., supra,* at 740; *Russo v Padovano,* 84 AD2d 925).

Here, the natural connotation of defendants' statements is that plaintiff was anti-Semitic and biased in her treatment of Jewish volunteers. Cross and brazen anti-Semitism would certainly be incompatible with the proper conduct of plaintiff's duties as she was in a position where she had regular and substantial interaction with the public, as well as the Museum's volunteers, a number of whom are Jewish. Since the ability to interact with the many diverse peoples that make up the Museum's patrons is essential to the successful performance of her supervisory duties, defendants' allegations reference a matter of significance and importance to plaintiff's profession and are not merely a general reflection upon her character or qualities *(Liberman v Gelstein, supra,* at 436; Prosser and Keeton, Torts § 112, at 791 [5th ed]).

■ Defendants also assert, unpersuasively, that the IAS Court should have dismissed the tort claims against the individual defendants on the grounds that such claims are merely an attempt to interpose wrongful discharge claims. Plaintiff's tort claims, however, are all brought under well-established, clearly defined causes of action under New York law and will not be dismissed based upon defendants' attempt to mischaracterize them as the defendants did not employ plaintiff and did not discharge her.

■ The IAS Court also correctly sustained plaintiff's cause of action for tortious interference with prospective business relations as an issue of fact exists as to whether defendants intentionally and maliciously interfered with plaintiff's known business relationship, specifically her continued employment by the Museum, without justification *(Guard-Life Corp. v Parker Hardware Mfg. Corp.,* 50 NY2d 183, 194; *NBT Bancorp. v Fleet/Norstar Fin. Group,* 215 AD2d 990; *Datlow v Paleta Intl. Corp.,* 199 AD2d 362, 363; *West v Mohawk Commercial Carpets,* 183 AD2d 182, 185).

■ Finally, plaintiff's cause of action for intentional infliction of emotional distress against the individual defendants[3] must be dismissed. In order to set forth such a claim, plaintiff must allege extreme and outrageous conduct which either intentionally or recklessly caused her severe emotional distress *(Fischer v Maloney,* 43 NY2d 553, 557). The conduct must be " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community' " *(Murphy v American Home Prods. Corp.,* 58 NY2d 293, 303, quoting Restatement [Second] of Torts § 46, comment *d; see also, Howell v New York Post Co.,* 81 NY2d 115, 122; *Fischer v Maloney, supra,* at 557; *Foley v Mobil Chem. Co.,* 214 AD2d 1003, 1005; *Cohen v Feiden,* 213 AD2d 696, 698).

While the use of racial or ethnic epithets has been found to be deplorable and to evidence a certain "narrowmindedness

---

3. We reject defendants' contention that plaintiff's ministerial error in omitting this cause of action from the first amended complaint was designed to prejudice defendants and gain an advantage over them on appeal and we find defendants' claims of bad faith to be entirely without support or substance. Moreover, allowing plaintiff to re-add the cause of action would have caused defendants no prejudice as the issue had been extensively briefed by the parties in the motion before the IAS Court.

and meanspiritedness" *(Leibowitz v Bank Leumi Trust Co.,* 152 AD2d 169, 182 [where the use of the terms "Hebe" and "Kike" was strongly disapproved and condemned but was found to be not so extreme or outrageous as to meet the threshold requirement for a cause of action of intentional infliction of emotional distress]), and allegations of sexual harassment and discrimination were found to be wholly inappropriate but not so outrageous in character or so extreme in degree as to be wholly intolerable in a civilized community *(Foley v Mobil Chem. Co., supra,* at 1005), the courts have been reluctant to allow recovery for their use under the banner of intentional infliction of emotional distress absent a "deliberate and malicious campaign of harassment or intimidation" *(Nader v General Motors Corp.,* 25 NY2d 560, 569).

In view of the foregoing, we find that it would be inconsistent to deny an action for emotional distress caused by the use of ethnic slurs, while allowing one for being falsely labelled as a user of such slurs. While the alleged conduct is clearly reprehensible, it does not rise to the level of outrage required to recover under a cause of action that is limited to only the most egregious of acts.

In any event, the plaintiff's cause of action for intentional infliction of emotional distress must also fail because it falls within the ambit of other traditional tort liability which, in this case, is reflected in plaintiff's causes of action sounding in defamation *(Fischer v Maloney, supra,* at 558; *Butler v Delaware Otsego Corp.,* 203 AD2d 783, 784-785; *Durepo v Flower City Tel. Corp.,* 147 AD2d 934, 935).

Accordingly, the order of the Supreme Court, New York County (Edward Greenfield, J.), which was entered on January 13, 1994 *(Herlihy v Metropolitan Museum of Art,* 160 Misc 2d 279), and which, *inter alia,* denied defendants' motion to dismiss plaintiff's causes of action as against them for slander, slander per se, tortious interference with business relations and intentional infliction of emotional distress, is unanimously modified, on the law, to the extent of dismissing the cause of action for intentional infliction of emotional distress, and otherwise affirmed, without costs.

MURPHY, P. J., RUBIN, ROSS and WILLIAMS, JJ., concur.

Order, Supreme Court, New York County, entered January 13, 1994, modified, on the law, to the extent of dismissing the cause of action for intentional infliction of emotional distress, and otherwise affirmed, without costs.