OPINION OF THE COURT
Arlene P. Bluth, J.
Motion sequence Nos. 9, 10, 11, 12 and 13 are consolidated for disposition. Because motion sequence No. 13 consists of dis-positive motions, that motion and its cross motion for summary judgment will be addressed first.
Background
Plaintiff Robert Cardali and defendant Richard Slater are both experienced attorneys who specialize in personal injury cases. Slater worked for Cardali’s various firms for over 20 years. On August 19, 2010, the parties had an argument and Cardali fired Slater.
When personal injury lawyers work on a contingency fee basis, they do not get paid for their efforts as the case progresses; instead, the lawyer collects his or her fee at the end of the case. That fee is usually one third of the net recovery. “Net recovery” as used here means the amount left over after the expenses are reimbursed. For example, if the lawyer has laid out $4,000 in expenses and the case settles for $100,000, then the net recovery is $96,000. The lawyer would first be reimbursed for his out of pocket expenses, $4,000 in this example, and the net recovery of $96,000 would be distributed $64,000 to the client and $32,000 to the lawyer. In that example, the lawyer *1006 walks away with $36,000 ($32,000 for his labor and $4,000 for his expenses) and the client gets $64,000.
On the other hand, if the expenses were $10,000, then the net recovery would be $90,000 which would be split $60,000 to the client and $30,000 to the lawyer. In this example, the lawyer would walk away with $40,000 ($30,000 for his labor and $10,000 for expenses) and the client would only receive $60,000.
The more money that is attributable to expenses, the more money the lawyer gets and the less money the client gets. This creates an opportunity for an unscrupulous lawyer to pad expenses.
Here, Mr. Cardali did more than just pad expenses. He engaged in double-dipping. That is, after entering into an agreement promising the client that his labor for the case would be capped at one third of the net recovery, Mr. Cardali hired people outside his firm to do the work (for example, motion practice) and billed the client for that lawyer’s fee. So the client ended up paying twice for the same work—the client paid Mr. Cardali one third of the net recovery plus the client was charged and paid the lawyer who actually did the work out of the expenses deducted from the recovery. It is this outrageous practice that is the root of this case.
While at the Cardali firm, one of the clients Slater represented, and with whom he built a rapport, was Mr. Spence. After Slater left the firm, he discovered that Mr. Spence was a victim of Cardali’s double-billing scheme; outside counsel costs for farmed-out trial-level legal work were billed and hidden as “appellate work” even though there was no appellate work on the case whatsoever. Mr. Spence was overcharged $8,400 that Cardali paid to an outside firm on a motion for summary judgment; again, if Cardali wanted to pay someone to make or oppose a motion, that is allowable. But if Cardali paid another lawyer to make or oppose a motion, that lawyer’s fee ought to have come out of Cardali’s share of the recovery; that is, Cardali should have paid that lawyer himself. Clearly, charging the client for outside counsel fees and collecting the full contingency fee is double-billing. Slater wrote to Anthony Broc-eólo, another experienced attorney at the firm, the following note: “Anthony—Rob [Cardali] put my reputation and career in jeopardy because of what he did, in my opinion on Spence. For that reason, he is nothing more than a common criminal. Feel free to show this to whoever you wish to. RNS [Richard Slater].”
*1007 This handwritten note is the basis for the first through third causes of action in the complaint (libel and libel per se). The fourth cause of action is for slander because Slater left the following voice mail on the law firm’s answering machine: “I am making this phone call pursuant to specific instructions given to me by [two former clients of Cardali]. They wanted me to advise you that they are seriously considering promptly approaching the Rackets Bureau of the District Attorney’s Office.”
And so started this litigation for defamation, which has lasted six years, many conferences and 13 motions. The First Department Disciplinary Committee investigated Cardali’s tactics and determined that Cardali’s firm violated ethics standards (Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.5; Code of Professional Responsibility DR 2-106, DR 2-107 [22 NYCRR 1200.11, 1200.12]) for its actions and sanctioned it by imposing an admonishment. The Disciplinary Committee stated that Cardali’s firm received only an admonishment because it had relied, in part, upon the advice of an ethics attorney.
Discussion
To be entitled to the remedy of summary judgment, the moving party “must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to [demonstrate the absence of] any material issues of fact from the case” (Winegrad, v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]). The failure to make such prima facie showing requires denial of the motion, regardless of the sufficiency of any opposing papers (id.). When deciding a summary judgment motion, the court views the alleged facts in the light most favorable to the non-moving party (Sosa v 46th St. Dev. LLC, 101 AD3d 490, 492 [1st Dept 2012]). Once a movant meets its initial burden, the burden shifts to the opponent, who must then produce sufficient evidence to establish the existence of a triable issue of fact (Zuckerman v City of New York, 49 NY2d 557, 560 [1980]). The court’s task in deciding a summary judgment motion is to determine whether there are bona fide issues of fact and not to delve into or resolve issues of credibility (Vega v Restani Constr. Corp., 18 NY3d 499, 505 [2012]). If the court is unsure whether a triable issue of fact exists, or can reasonably conclude that a fact is arguable, the motion must be denied (Tronlone v Lac d'Amiante Du Quebec, 297 AD2d 528, 528-529 [1st Dept 2002], affd 99 NY2d 647 [2003]).
*1008 Here, there are cross motions for summary judgment; both Cardali and Slater agree that there are no issues of fact. Slater admits he wrote the note and left the voice mail. The parties just disagree on the import of Slater’s note to Broccolo and the message left on the firm’s voice mail about being reported to the District Attorney.
Defamation and Defamation Per Se
Defamation is “the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society” (Foster v Churchill, 87 NY2d 744, 751 [1996] [internal quotation marks omitted]). In order to prove a claim for defamation, the plaintiff must show: (1) a false statement that is (2) published to a third party (3) without privilege or authorization and that (4) plaintiff is caused harm, unless the statement is one of the types of publications actionable regardless of harm (see Dillon v City of New York, 261 AD2d 34, 38 [1st Dept 1999]). Further, the “words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction” (id. at 38). “Loose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable” (id.).
“A false statement constitutes defamation per se when it charges another with a serious crime or tends to injure another in his or her trade, business, or profession” (Geraci v Probst, 61 AD3d 717, 718 [2d Dept 2009]).
Common Criminal
No reasonable person would think Slater was spreading false rumors that Robert Cardali was a convicted felon or even that he was arrested for any crime. Slater did not call Cardali an embezzler or even a thief; he called him a “common criminal.” Certainly, Broccolo and even any ordinary layperson reading the note in context had to have known that “nothing more than a common criminal” obviously meant that Slater thought that Cardali was a lowlife or a dishonest person. A nationwide West-law search for the term “common criminal” brings up cases, *1009 other than those which deal with a “common criminal enterprise,” where people (usually white-collar criminal defendants) complain that they were treated, often by the police, as “common criminals.” These individuals lodge complaints that their handcuffs were too tight, they were treated with disrespect or that they were denied access to a bathroom.
Common criminals are people who do not conform to commonly held standards of conduct in society. The term “common criminal” is a non-specific pejorative description of someone with whom upstanding, law-abiding people would not want to associate. “Upstanding” is also a non-specific term, but, in context, the reader knows what is meant.
The Parties’ Contentions
Cardali moves for partial summary judgment on the first two causes of action, libel per se and libel, and to dismiss Slater’s affirmative defenses. He also moves for attorney’s fees, to freeze Slater’s assets, the deposition of Slater’s brother in Florida and other relief.
Slater cross-moves for summary judgment to dismiss all four remaining causes of action (the third cause of action for libel is based on the same note but is a claim by Cardali’s law firm and the fourth cause of action is slander based on the voice mail message).
Cardali makes much ado about being called a common criminal. First, he alleges that what he did was not criminal, but civil. This contention is of no import. Whether Cardali was charged with or committed a specific crime is irrelevant— considering that a “common criminal,” in context, meant a lowlife and a lawyer who would double-bill unsuspecting clients. In fact, it was an appropriate characterization for the admitted civil wrong.
Cardali’s main point, emphasized at oral argument, is that Cardali, as an attorney, is entitled to special protection—that calling a lawyer a common criminal is worse than calling a layperson or any other professional a common criminal because lawyers are held to a high standard with respect to the law. In support of that proposition, Cardali cites seven cases, which he waited to cite until his reply (see reply affirmation ¶ 67). None of those cases give special protection to lawyers; none of those cases lower the burden on a plaintiff lawyer when he is called a crook, and none granted summary judgment to the plaintiff. And in none of those cases was there a finding by the Disciplin *1010 ary Committee, and an admission by the lawyer, that the underlying allegation (here, of double-billing) was true. Because Cardali relies so heavily on these cases, each of the seven cases is analyzed below.
In Kleeberg v Sipser (265 NY 87 [1934]), the Court found that statements accusing the attorney of being unethical and disloyal to the best interest of his client were actionable. That does not mean, as plaintiff argues, that calling a lawyer a common criminal is worse than calling anybody else a common criminal; it means that to falsely accuse someone of being terrible in their profession is actionable. A lawyer should always act in the best interest of his client and not put his pecuniary interests ahead of the client. This court agrees and so did the Disciplinary Committee, which found that the Cardali firm was violating ethics standards, getting more money than it was entitled to receive, and the clients were getting less than they were entitled to receive. That certainly is not in the best interests of the client. Applying the principles of Kleeberg to the facts here, truth is an absolute defense. Kleeberg does not help Cardali.
Afshari v Barer (1 Misc 3d 57 [App Term, 2d Dept, 2d & 11th Jud Dists 2003]) does not help plaintiff either. The decision involves a post-jury verdict motion regarding the applicability of privilege to the statements. The jury found the statements were libelous “inasmuch as they accused him of a serious crime [embezzlement] and tended to injure him in his profession” (id. at 58). There is nothing in the decision which indicates calling a lawyer an embezzler is any worse than calling a banker or cashier an embezzler. Besides, the Afshari jury found that plaintiff was not an embezzler; the Disciplinary Committee found that Cardali was overbilling clients.
Likewise, in Campanella v Pursley (25 Misc 2d 54 [Sup Ct, Nassau County 1960]), attorneys sued because they were called incompetent. The court found “the attack was clearly directed at the ability of the plaintiffs in their professional capacity as attorneys and such as to injure them in that capacity” (id. at 56). There is no discussion that calling attorneys incompetent is any worse than calling doctors or mail carriers incompetent. Cardali’s competence was not the issue; Cardali’s honesty was. This case does not help Cardali.
In Zator v Nowy Swiat Publ. Co., Inc. (245 App Div 830 [2d Dept 1935]), the Court found that likening plaintiff, an attorney, to a street demagogue and perjurer was actionable *1011 because it affected his professional standing as an attorney, particularly in his closely-knit Polish community. But there is nothing in the decision that even hints that the decision would be different if plaintiff had been a stockbroker, accountant or teacher in the same community.
Van Lengen v Parr (136 AD2d 964 [4th Dept 1988]) is no different. Because the trial court erred in dismissing the complaint for failure to plead special damages (mixing up defamation and defamation per se) the Fourth Department explained that because the “words clearly address the subject of plaintiff’s ability to practice his profession and were disparaging of his mental capacity and competence as a lawyer” it was defamation per se and special damages need not be pleaded (id. at 965). Nowhere does the Court even cite the specific language defendant used, or say that hurting a lawyer’s reputation is any easier than hurting a psychoanalyst’s or landscaper’s reputation.
In Schindler v Mejias (100 AD3d 1315 [3d Dept 2012]), defendant accused an attorney in private practice of representing himself as the district attorney. The Court found it was defamation per se because an “allegation of such conduct by an attorney would be taken very seriously, likely inviting disciplinary action and ... it may be presumed to result in damage to plaintiff’s professional reputation. Indeed, such an impersonation would no doubt demonstrate a total disregard for plaintiff’s professional ethical obligations” (id. at 1317 [internal quotation marks and citations omitted]). There is nothing in that decision that says that a lawyer impersonating a district attorney is any worse to his professional standing than a police officer impersonating a dentist. Besides, here there already was a finding that plaintiff did violate ethics standards and the disciplinary code; truth is a defense.
In Dai & Assoc., P.C. v Feng Gao (31 Misc 3d 1229[A], 2011 NY Slip Op 50901[U] [Sup Ct, Queens County 2011]), Mr. Gao was unhappy with the results of his cases. He decided that his lawyers had colluded with Dai, who represented the other side. Gao put up posters all over Flushing, Queens (the Dai firm’s closely-knit Chinese community) accusing Dai of collusion, fraud and forgery and Dai sued for defamation. The decision is pure dicta, no findings were made, it was on default and “[t]he Court thus denie[d] the relief requested in the order to show cause, without prejudice, as premature” (Feng Gao, 2011 NY Slip Op 50901[U], *5). But even the court’s musings did not, as *1012 plaintiffs claim, state that calling a lawyer a common criminal is worse than calling a police officer or banker a common criminal. The Justice observed, “To charge lawyers with collaborating with an adversary counsel to effect and engineer a result and to use fraud and forgery [if false] would constitute defamation per se” (id. at *2). There is a big difference between alleging specific conduct (forging documents, collaborating with an adversary) and calling someone a common criminal. The first are specific crimes and activities which would injure a lawyer in his profession. The second is an opinion that the person is a lowlife.
In summary, Cardali’s claim that calling a lawyer a common criminal is worse than calling any other professional a common criminal is unsupported.
Cardali Has Not Shown the Statement was False
The first thing a plaintiff must show to prove defamation is that the statement was false. Cardali’s double-dipping scheme redirected money from his clients to his firm. His clients agreed that he would get one third of the net recovery in full satisfaction for all of his labor but Cardali hired someone else to do the work and hid that as an expense the client would have to pay. If he had absorbed the cost himself, it would be an entirely different story. But he didn’t; he made his clients pay twice for the same work.
Therefore, this court finds that, in context, “common criminal” meant that Robert Cardali was an untrustworthy double-dealer who was taking advantage of his clients. The record before this court demonstrates that this allegation was true.
It was Slater’s Opinion
Although a high school English teacher would shudder at Slater’s grammar, he clearly conveys that in his opinion, what Cardali did to Mr. Spence was wrong. And because of that opinion (“For that reason”), Cardali was nothing more than a common criminal. The law protects Mr. Slater in expressing his opinions.
It is well-settled that “[expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation” (Davis v Boeheim, 24 NY3d 262, 269 [2014]). Whether a particular statement constitutes an opinion or an objective fact is a question of law (see Rinaldi v Holt, Rinehart & Winston, 42 *1013 NY2d 369, 381 [1977], cert denied 434 US 969 [1977]). Certain factors must be considered to distinguish between statements of “fact” and privileged expressions of opinion; these factors are:
“(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether . . . the full context of the communication [signals to] . . . readers or listeners that what is being read or heard is likely to be opinion, not fact” (Brian v Richardson, 87 NY2d 46, 51 [1995], quoting Gross v New York Times Co., 82 NY2d 146, 153 [1993] [internal quotation marks and citations omitted]).
As for the first factor, the specific language “common criminal” does not have a precise meaning such that it could constitute a false “fact.” Slater did not, for instance, claim that Cardali committed grand larceny against his clients, fraudulently billed them, or breached his fiduciary duty.
With respect to the second factor, whether the statements are capable of being proved true or false, Slater’s statements constituted an opinion and opinions are not capable of being true or false. Slater may have a low opinion of Cardali, but reasonable people can disagree, although it is unlikely that any ethical attorney would hold Cardali in high esteem if they knew of his double-billing scheme.
The third factor, considering the entire context, compels the conclusion that Slater qualified his statement as opinion; he said “in my opinion.” It was an opinion Slater was entitled to have and an opinion Slater was entitled to share.
Here, considering the context of Slater’s note about Cardali’s overcharging certain clients, a reasonable reader would determine that the remarks were Slater’s opinion, which are non-actionable due to the privilege. Mr. Broccolo knew the facts upon which Slater based his opinion, and Slater even wrote that because of those facts, it was his opinion that Cardali was nothing more than a common criminal. A reasonable reader of that note, which Slater specifically qualified as his opinion, would not interpret Slater as informing the reader that Robert Cardali was a convicted, or even an indicted, criminal. Rather, it was in direct response to Slater’s opinion of Cardali’s low-life double-dipping practice (see Pecile v Titan Capital Group, LLC, 96 AD3d 543, 544 [1st Dept 2012] [hold *1014 ing that “(t)he use of the term ‘shakedown’. . . did not convey . . . that . . . defendants ‘were seriously accusing (plaintiffs) of committing . . . extortion’ ” (internal quotation marks and citation omitted)]; see also Trastco Bank of N.Y. v Capital Newspaper Div. of Hearst Corp., 213 AD2d 940, 942 [3d Dept 1995] [holding that a newspaper’s use of the word “extortion” to describe a lawsuit was non-actionable opinion]). Because a reasonable reader would not conclude that Cardali was actually convicted of crimes, but would instead conclude that Slater felt that Cardali’s disreputable practice was disgraceful, the note is privileged and non-actionable as a matter of law.
Common Interest
One must put Slater’s note into context. He did not put up a billboard on the Brooklyn-Queens Expressway or take an advertisement out in the New York Post. He left a note for another attorney who worked for Cardali. Moreover, Slater attached the note he gave Broccolo to the business card of an investigator from the Disciplinary Committee.
Slater claims that the note he gave to Broccolo is also protected by a qualified privilege.
“Under New York law, communications protected by a qualified privilege do not provide the communicant with an immunity against the imposition of liability in a defamation action. Rather, good-faith communications by a party having an interest in a subject, or a moral or societal duty to speak, are protected by a qualified privilege if made to a party having a corresponding interest” (Herlihy v Metropolitan Museum of Art, 214 AD2d 250, 258 [1st Dept 1995] [internal quotation marks and citations omitted]).
“The underlying rationale behind a qualified privilege is that so long as the privilege is not abused, the flow of information between parties sharing a common interest should not be impeded” (id. at 259 [internal quotation marks and citation omitted]). “A qualified privilege, however, is conditioned on its proper exercise, and cannot shelter statements published with malice or with knowledge of their falsity or reckless disregard as to their truth or falsity” (id. [internal quotation marks and citations omitted]).
If a lawyer, as an officer of the court, is aware of another lawyer’s ethical breaches, that lawyer is under a duty to report it to the proper authorities; here, the Disciplinary Committee. *1015 Slater reported it; if Broccolo knew what Cardali was doing, then he, too, was under a duty to report it. Broccolo thus had a corresponding interest and Slater had the qualified privilege.
All Libel Claims are Dismissed
 “A false statement constitutes defamation per se when it charges another with a serious crime or tends to injure another in his or her trade, business, or profession” (Geraci v Probst, 61 AD3d 717, 718 [2d Dept 2009]). Being called a common criminal is not an assertion that Cardali was convicted of a serious crime or a charge that Cardali is guilty of serious crime. In any event, the defamation per se allegations also are dismissed with prejudice as privileged because they are expressions of opinion and fall under the qualified privilege and are, in context, true. Moreover, plaintiff has failed to cite specific instances demonstrating that he was injured in his profession because of Richard Slater’s opinion of Cardali. Therefore, all of plaintiffs libel claims fail (Godfrey v Spano, 13 NY3d 358, 373 [2009] [“conclusory allegations—claims consisting of bare legal conclusions with no factual specificity—are insufficient to survive a motion to dismiss” (citation omitted)]).
Fourth Cause of Action—Slander
The cause of action for slander is based on the voice mail message left on the Cardali firm’s machine “advising” the listener that “I am making this phone call pursuant to specific instructions given to me by [two former clients of Cardali]. They wanted me to advise you that they are seriously considering promptly approaching the Rackets Bureau of the District Attorney’s Office.”
The complaint alleges that Slater lied and the former clients were not considering approaching the District Attorney, or that Slater put the former clients up to it, or many other possibilities. Even assuming that this was just Slater’s veiled threat, it still does not constitute slander. If he falsely said that the Rackets Bureau had indicted Cardali and his cohorts, then that might be slander. But threatening to report Cardali’s improper double-billing and improper referral fee arrangements (which the Disciplinary Committee also found the Cardali firm had committed) to the District Attorney is not slander. Quite simply, threatening to bring perceived wrongdoing to the attention of the authorities is not slander.
*1016 Summary
For the reasons cited above, Cardali has failed to show defamation and his motion is denied. For the many reasons detailed above, Slater’s cross motion to dismiss the complaint in its entirety is granted. The statement in the note was true, it was protected opinion and it was subject to the qualified privilege of a common interest of another attorney who worked for the double-billing employer. Any one of those reasons is a complete defense to the defamation claims.
Likewise, the third cause of action, by Robert A. Cardali and Associates LLP for libel, is also dismissed. This is a derivative-type claim; paragraph 55 of the complaint claims: “The reputation and viability of Cardali LLP as a business entity is solely dependent on the professional reputation and standing of Plaintiff Robert Cardali.” Cardali’s firm cannot escape the questionable conduct of Cardali himself. Nevertheless, Richard Slater is allowed to express his opinion that Robert Cardali is a lowlife.
And the slander claim fails because the statement is simply not slander. Someone is entitled to announce he intends to report perceived wrongdoing to the proper authorities.
As the complaint is dismissed, motion sequence Nos. 9, 10, 11 and 12 are denied as moot.
Accordingly, it is hereby ordered that as for motion sequence No. 13, Cardali’s motion for summary judgment is denied and Slater’s cross motion for summary judgment is granted and the case is dismissed with prejudice and the clerk is directed to enter judgment for defendant Slater, with costs and disbursements as allowed by law; and it is further ordered that motion sequence Nos. 9, 10, 11 and 12 are denied as moot.